1   **Darren A. Jones**  State Bar # 207966
    HOME SCHOOL LEGAL DEFENSE ASSOCIATION
2   One Patrick Henry Circle
    Purcellville, VA 20132
3   Phone: (540) 338-5600
    Fax: (540) 338-1952
4   Email: darren@hslda.org

5   **Rex Alan Lowe, Esq.**  State Bar #103750
    LAW OFFICE OF REX ALAN LOWE
6   630 South El Camino Real, Suite A
    San Clemente, California 92672-4200
7   Tel.: 949.489.3045
    Fax: 949.334.1223
8   E-mail: Law@RexLowe.com

9   *Attorneys for Plaintiffs Vanessa Wilson, N.F., and N.K.*

10              **IN THE FEDERAL DISTRICT COURT**
                   **OF CENTRAL CALIFORNIA**
11                    **EASTERN DIVISION**

12  _____
    **VANESSA WILSON**, individually and as          )     **Case/Docket No. _____**
13  parent and next friend of N.F. and N.K.,        )
    her minor children; **N.F.**, a minor child; and )
14  **N.K.**, a minor child,                         )          **COMPLAINT**
                                    *Plaintiffs,*    )     **Civil Action - Damages**
15                 *v.*                              )
                                                     )
16  **FRANCISCA RUSSO**, Riverside County            )     <u>**Case-Initiating Document**</u>
    Department of Public Social Services Child       )
17  Protective Services, in her individual           )     **DEMAND FOR JURY TRIAL**
    capacity;                                        )
18                                                   )
    **CARLA SANTANA**, Riverside County              )
19  Department of Public Social Services Child       )
    Protective Services, in her individual capacity; )

20  _____
                          - 1 -
              **CIVIL COMPLAINT FOR DAMAGES**

| | |
|---|---|
| 1 | **COLLEEN CHAMBERS-MUNOZ,** ) <br> Riverside County Department of Public Social ) |
| 2 | Services Child Protective Services, in her ) <br> individual capacity; ) |
| 3 | **KEITH BAKER**, Riverside County ) <br> Department of Public Social Services Child ) |
| 4 | Protective Services, in his individual capacity; ) <br> ) |
| 5 | **MARIBELL PARTIDA**, Riverside County ) <br> Department of Public Social Services Child ) |
| 6 | Protective Services, in her individual capacity; ) <br> and ) |
| 7 | ) |
| 8 | **S.W. JONES**, Riverside County Department ) <br> of Public Social Services Child Protective ) <br> Services, in her individual capacity, ) |
| 9 | ) |
| 10 | *Defendants.* ) <br> _____ ) |

11

## JURISDICTION AND VENUE

12    1.    This is a civil action commenced pursuant to 42 U.S.C. § 1983.

13  Jurisdiction is conferred on this court by 28 U.S.C. § 1343(3) and 1343(4), which

14  provide for original jurisdiction in this court of all suits brought under § 1983; 28

15  U.S.C. § 1331(a) in that causes of action arise under the Constitution and laws of

16  the United States; and 28 U.S.C. § 1367, in that causes of action arising under state

17  law are so related to the claims within the original jurisdiction of the court that they

18  form part of the same case or controversy under Article III of the Constitution.

- 2 -

**CIVIL COMPLAINT FOR DAMAGES**

1   2.   Venue properly lies in this court pursuant to 28 U.S.C. § 1391 in that

2   at least one Defendant resides in this federal district, all Defendants reside in the

3   State of California, and a substantial part of the events or omissions giving rise to

4   these claims occurred in this federal district.

5   ## STATEMENT OF THE CASE

6   3.   This is a civil action commenced pursuant to 42 U.S.C. § 1983 to

7   redress the deprivation by the Defendants of rights secured to the Plaintiffs, Vanessa

8   Wilson individually and as parent and next friend of N.K. (born 2007) and N.F.

9   (born 2009), under the Fourth and Fourteenth Amendments to the United States

10  Constitution. Defendants, under color of law, unlawfully removed N.K. and N.F.

11  from their home without probable cause, exigent circumstances, or other

12  constitutional justification; unlawfully and involuntarily separated and detained N.K.

13  from his mother for twenty-nine (29) days without probable cause, exigent

14  circumstances, or other constitutional justification; unlawfully and involuntarily

15  separated and detained N.F. from her mother for fifty (50) days without probable

16  cause, exigent circumstances, or other constitutional justification; and withheld

17  exculpatory evidence of which Defendants knew or should have known, and which

18  Defendants had a duty to disclose to Plaintiffs, Plaintiffs' counsel, and the superior

19  court, in violation of the federal constitution.

**CIVIL COMPLAINT FOR DAMAGES**

4.      Plaintiffs also bring a state law claim in tort against Defendants for their tortious failure to disclose the results of material medical examinations in the actual or constructive possession of Defendants, in violation of a statutory duty imposed upon them by CAL. WELF. & INST. CODE § 324.5(a) (2014).

**PARTIES**

5.      Vanessa Wilson and her minor children, N.K. (born 2007, hereinafter "Son") and N.F. (born 2009, hereinafter "Daughter") are United States citizens who reside in Rogue River, Oregon.

6.      Defendant Francisca Russo is a caseworker employed by the Riverside County Department of Public Social Services Child Protective Services and at all pertinent times herein was on or about its business in the course and scope of her employment.

7.      Defendant Carla Santana is a casework supervisor employed by the Riverside County Department of Public Social Services Child Protective Services and at all pertinent times herein was on or about its business in the course and scope of her employment.

8.      Defendant Colleen Chambers-Munoz is a caseworker employed by the Riverside County Department of Public Social Services Child Protective Services

**CIVIL COMPLAINT FOR DAMAGES**

1    and at all pertinent times herein was on or about its business in the course and scope

2    of her employment.

3        9.    Defendant Keith Baker is a caseworker employed by the Riverside

4    County Department of Public Social Services Child Protective Services and at all

5    pertinent times herein was on or about its business in the course and scope of her

6    employment.

7        10.    Defendant Maribell Partida is a casework supervisor employed by the

8    Riverside County Department of Public Social Services Child Protective Services

9    and at all pertinent times herein was on or about its business in the course and scope

10   of her employment.

11       11.    On information and belief, Defendant S.W. Jones is a caseworker

12   employed by the Riverside County Department of Public Social Services Child

13   Protective Services and at all pertinent times herein was on or about its business in

14   the course and scope of her employment.

15                                **FACTS**

16       12.    On January 2, 2014, Vanessa, Son, and Daughter resided in Hemet,

17   California.

18       13.    On January 2, 2014, Vanessa observed that her four-year-old daughter,

19   N.F., was experiencing flu-like symptoms and lethargy. When Daughter did not

**CIVIL COMPLAINT FOR DAMAGES**

1  respond to typical home treatment and over-the-counter medications, Vanessa took

2  Daughter to Riverside County Regional Medical Center (hereinafter "RCRMC").

3        14.    At RCRMC, Daughter was diagnosed with new-onset type 1 juvenile

4  diabetes. Daughter remained at RCRMC for five days, receiving treatment for her

5  newly-diagnosed diabetes under the care of Dr. Renata Swanston, a pediatrician.

6        15.    On January 3, 2014, while Daughter was still at the hospital, Vanessa

7  was visited by Anthony Negron, a caseworker employed by the Riverside County

8  Department of Public Social Services Child Protective Services (hereinafter

9  "Department"). Negron is not a party to this proceeding.

10        16.    Negron performed an intake interview on Vanessa's family history and

11  asked Vanessa to take a drug test.

12        17.    Vanessa took the drug test, which was negative.

13        18.    At the conclusion of his intake interview, Negron expressed no concerns

14  about Vanessa's ability to care for Daughter's diabetes.

15        19.    On January 8, 2014, hospital officials at RCRMC administered a

16  hemoglobin A1C test to Daughter, prior to discharging her from the hospital.

17        20.    A hemoglobin A1C test is a blood test used to diagnose type 1 and

18  type 2 diabetes, and to measure management of diabetes over time. The result of a

19  hemoglobin A1C test measures what percentage of the subject's hemoglobin is

- 6 -
**CIVIL COMPLAINT FOR DAMAGES**

1    coated with sugar, which is proportional to the amount of glucose in the blood. The

2    test measures the average blood sugar level of the subject over the three months

3    preceding the test date.

4         21.    A hemoglobin A1C test, which measures average blood sugar levels

5    over time, differs from a blood glucose meter test, which measures blood sugar levels

6    at a given point in time.

7         22.    A blood glucose meter is a handheld instrument that tests the level of

8    glucose in the blood using a drop of blood, usually obtained by pricking a finger or

9    other site with a lancet. The blood is then placed on a small strip that is read by the

10   meter. The meter then calculates and displays the subject's current blood glucose

11   level as a number on the meter's digital display. Many blood glucose meters have

12   the capability to store a limited number of past metered readings on the meter

13   itself, or to upload past readings to a smartphone or other electronic storage device.

14        23.    On January 8, 2014, Daughter's hemoglobin A1C test result was eleven

15   percent (11%), which converts to an average blood sugar level of 269. This level is

16   consistent with the recent diagnosis of a child with new-onset type 1 juvenile

17   diabetes.

18        24.    Prior to Daughter's discharge from the hospital, her blood sugar level

19   was also tested with a glucometer, which reported a blood glucose level of 435.

- 7 -
**CIVIL COMPLAINT FOR DAMAGES**

25.     Vanessa was told that this reading was acceptable for Daughter's release from the hospital.

26.     Dr. Swanston discharged Daughter from RCRMC, and provided Vanessa with written instructions to notify the hospital if Daughter's blood glucose meter readings were above 400 in the future.

27.     At discharge, Vanessa obtained a blood glucose meter in order to take regular readings of Daughter's blood sugar levels.

28.     On January 9, 2014, Negron visited Vanessa's residence in Hemet, California.

29.     Negron interviewed Vanessa and Daughter, observed Daughter's medical supplies, and reviewed the logs and notes that Vanessa was keeping to monitor Daughter's diabetes. Negron expressed no concerns about the medical care Vanessa was providing to Daughter.

30.     On January 10, 2014, Vanessa took Daughter to a follow-up appointment at RCRMC. The pediatrician who examined Daughter expressed no concerns about Vanessa's ability to treat Daughter.

31.     On January 13, 2014, Vanessa attended a Team Decision Making (TDM) meeting at the offices of the Department in Hemet, California.

**CIVIL COMPLAINT FOR DAMAGES**

32.     At this meeting, Vanessa met Defendant Francisca Russo, who attended the meeting in her capacity as a caseworker employed by the Department.

33.     On information and belief, Russo has been employed by the Department as a social worker since at least 2005.

34.     At the TDM meeting, Negron indicated that he was impressed with Vanessa's homeschooling, and listed homeschooling as a strength for the family, based on his interactions with the children.

35.     Neither Russo, Negron, nor any other caseworker in attendance at this meeting indicated that they had any concerns about Vanessa's ability to care for Daughter's medical needs. Nevertheless, the Department and Vanessa agreed to an action plan and scheduled a follow-up visit to Vanessa's residence on January 16, 2014.

36.     After the meeting, Russo told Vanessa that this was "a very personal case" for Russo because she had type 2 diabetes, or words to that effect.

37.     On January 16, 2014, Negron arrived at Vanessa's home one hour after their scheduled visit was to have taken place. Negron was surprised to learn that none of the other Department staff had arrived, and called the Department's office to determine what happened. Negron learned that Russo had been hospitalized, and asked to reschedule the visit for January 28, 2014.

- 9 -
**CIVIL COMPLAINT FOR DAMAGES**

1      38.    On January 28, 2014, no Department staff came to Vanessa's home

2  for the scheduled visit. No further home visits were scheduled.

3      39.    On February 5, 2014, Vanessa took Daughter to Dr. Swanston for a

4  follow-up visit. At this visit, Dr. Swanston told Vanessa that the glucose readings for

5  a child of Daughter's age could be as low as 60, especially in the early stages of

6  diagnosis. Dr. Swanston did not express any concern over Vanessa's care and

7  treatment of Daughter.

8      40.    On February 16, 2014, Vanessa informed Negron by phone that she

9  was moving to San Diego County to establish permanent housing.

10     41.    On February 25, 2014, Negron called Vanessa by phone to obtain the

11  address she would be staying at in San Diego County. Negron indicated to Vanessa

12  that he needed this information to "close our case," or words to that effect. There

13  was no indication that Negron was concerned about Vanessa's ability to care for

14  Daughter.

15     42.    On Monday, March 31, 2014, in response to a phone call from the San

16  Diego County Department of Social Services, Vanessa informed San Diego County

17  that she was once again residing in Hemet, and provided them with her temporary

18  address.

**CIVIL COMPLAINT FOR DAMAGES**

43.     On information and belief, on Tuesday, April 1, 2014, Russo received a ten-day referral with allegations of general neglect from a caseworker in San Diego County, who had been unable to locate Vanessa and believed her to be in Riverside County.

44.     On information and belief, the reporter alleged that Daughter had previously been hospitalized and diagnosed with diabetes, that Vanessa had not been taking Daughter to see her endocrinologist for follow up treatment, that Vanessa was planning to move to Oregon on April 3, 2014, and that Vanessa was currently living in a van in Hemet, California.

45.     In actual fact, Vanessa had previously taken Daughter for treatment at RCRMC from January 2, 2014 through January 8, 2014; Daughter had been diagnosed with new-onset type 1 juvenile diabetes; Daughter had been released from RCRMC on January 8, 2014, after receiving satisfactory results on a hemoglobin A1C test and blood glucose meter test; Vanessa had placed Daughter under the medical care of Dr. Swanston for regular examinations since Daughter was diagnosed with diabetes in January 2014; Vanessa had called the pediatric unit at RCRMC on the several occasions when Daughter's blood sugar level exceeded 400, as Dr. Swanston had instructed her to do when Daughter was originally discharged from RCRMC; Vanessa was contemplating moving to Oregon, and had already made

CIVIL COMPLAINT FOR DAMAGES

1   arrangements for Daughter to be cared for by another pediatrician in Oregon; and

2   Vanessa was temporarily living at the home of a family friend in Hemet, California.

3       46.    On information and belief, on Wednesday, April 2, 2014, Russo

4   discussed the referral from San Diego County with her supervisor, Defendant Carla

5   Santana.

6       47.    On information and belief, Russo then reviewed Negron's past

7   investigation of Vanessa in January 2014, including Negron's case notes and the

8   results of the TDM meeting held on January 13, 2014.

9       48.    On information and belief, these case notes contained information

10   and/or medical records pertaining to Daughter's treatment at RCRMC in January

11   2014, including the results of Daughter's hemoglobin A1C test and blood glucose

12   meter test administered prior to her discharge from RCRMC.

13       49.    On information and belief, Russo told Santana that that "it appeared

14   that [Vanessa] had not followed with the medical care of the child, [Daughter], as

15   this referral had basically the same concerns we encountered three months ago,

16   which originally had brought the family to the attention of the Department when

17   the child, [Daughter], was hospitalized for having uncontrolled sugar levels and

18   was lethargic and unconscious when admitted to the hospital," or words to that

19   effect.

**CIVIL COMPLAINT FOR DAMAGES**

1    50.    On information and belief, neither Russo nor Santana contacted Dr.

2    Swanston or any other person at RCRMC with relevant medical training or degree or

3    license, to discuss Daughter's past or current medical condition, or Vanessa's

4    medical care for Daughter.

5    51.    On information and belief, neither Russo nor Santana had medical

6    training, degree, or license that qualified them to make independent judgments

7    about the medical care of a four-year-old child with new-onset type 1 juvenile

8    diabetes.

9    52.    On information and belief, Russo and Santana agreed to have Russo

10   conduct a home visit at Vanessa's temporary residence on the following day.

11   53.    On information and belief, Russo did not call Vanessa or otherwise

12   inform her of the report that had been lodged against her, prior to conducting the

13   home visit.

14   54.    On information and belief, Russo and Santana agreed that Russo

15   should be accompanied by additional case workers and a deputy from the

16   Riverside County Sheriff's Department, in the event that they decided to remove

17   Daughter from Vanessa's custody.

18   55.    On Thursday, April 3, 2014, Vanessa and her two minor children were

19   temporarily residing in Hemet, California.

**CIVIL COMPLAINT FOR DAMAGES**

56.     At approximately 11:00 on the morning of April 3, 2014, Russo came to Vanessa's residence in Hemet, accompanied by fellow Riverside County caseworkers, Defendants Colleen Chambers-Munoz and S.W. Jones, and by a uniformed deputy from the Riverside County Sheriff's Department, who is not a party to this proceeding.

57.     Russo demanded that Vanessa permit her to enter the residence, and to interview Vanessa, Son, and Daughter.

58.     Russo did not present a court order authorizing her to enter Vanessa's residence.

59.     On information and belief, Russo did not have a court order authorizing her to enter Vanessa's residence.

60.     Vanessa greeted Russo cordially, and permitted her to come into the residence.

61.     Upon entering, Russo observed Son and Daughter playing.

62.     Russo observed that both Son and Daughter appeared awake, alert, and clean.

63.     Russo asked Vanessa if she could interview the children in private. Vanessa agreed.

**CIVIL COMPLAINT FOR DAMAGES**

64.     After interviewing the children, Russo then asked to examine Daughter's medical supplies.

65.     Vanessa permitted Russo to examine Daughter's insulin and other medical supplies.

66.     Russo then requested that Vanessa administer a blood glucose meter test to Daughter.

67.     Vanessa administered a blood glucose meter test to Daughter in Russo's presence.

68.     Daughter's blood glucose meter test resulted in a glucose reading of 261.

69.     Blood sugar levels detected by a blood glucose meter will vary, depending on a variety of factors, including the time of day that the test is conducted, the amount and type of food consumed by the subject, and whether the subject has recently exercised or has been ill. Because blood sugar levels are not static, the goal is, as much as possible, to confine their fluctuations within an acceptable range.

70.     The "normal" blood sugar range of a subject depends on the age and medical condition of the subject. The normal range of blood sugar readings for a person who is not affected by diabetes is approximately 100 to 200. For an

**CIVIL COMPLAINT FOR DAMAGES**

individual with type 1 diabetes, especially a young child, the ideal blood sugar range is between 80 and 300, but can commonly range between 80 and 400.

71.     Daughter's blood glucose meter reading of 261 was within the acceptable blood glucose range that Dr. Swanston had given Vanessa for a child of Daughter's age with new-onset type 1 juvenile diabetes.

72.     Daughter's blood glucose meter reading of 261 was significantly less than the reading of 435 taken at the time Daughter was discharged from RCRMC on January 8, 2014

73.     On information and belief, on April 3, 2014, Russo had actual knowledge or access to medical records that would have made her aware of Daughter's blood glucose meter reading taken at the time Daughter was discharged from RCRMC on January 8, 2014.

74.     After Vanessa administered the blood glucose meter test to Daughter in Russo's presence, Russo also personally reviewed forty-seven (47) other, prior blood glucose meter readings that had been stored in the blood glucose meter.

75.     Of these forty-seven readings, twenty (20) were within the "normal" range for a person who is not affected by diabetes, thirty-three (33) were within the ideal range for a four-year-old child with new-onset type 1 juvenile diabetes, and thirty-six (36) were within the common range for a four-year-old child with new-

**CIVIL COMPLAINT FOR DAMAGES**

1  onset type 1 juvenile diabetes. Of the remaining eleven readings, four (4) were

2  within 10 points of the common range for a four-year-old child with new-onset

3  type 1 juvenile diabetes, one (1) reading was below 70, three (3) readings were

4  over 410, and three (3) readings recorded an "error."

5        76.    On information and belief, Russo, based solely upon her personal

6  assessment of the blood glucose readings stored in Daughter's blood glucose meter

7  and her own experience with adult type 2 diabetes, determined that Daughter's

8  "normal" sugar levels should be within 80 and 110, that only three (3) of the readings

9  recorded on the blood glucose meter were within the "normal" range, and that the

10 remaining forty-four (44) readings were "abnormally high" and "too variable.

11       77.     On information and belief, Russo made these determinations without

12 any appropriate medical training, degree, or license.

13       78.    On information and belief, Russo made these determinations without

14 consulting Daughter's pediatrician, Dr. Swanston, or any other medical

15 professional who possessed appropriate medical training, degree, or license to

16 opine as to the normal blood sugar range of a four-year-old child with new-onset

17 type 1 juvenile diabetes.

18       79.    As an experienced case worker, Russo knew or should have known that

19 she was not qualified to make a medical determination about the blood sugar levels

**CIVIL COMPLAINT FOR DAMAGES**

1  of a four-year-old child with new-onset type 1 juvenile diabetes without direct

2  consultation with a qualified medical professional.

3      80.    When Russo asked Vanessa about Daughter's medical care, Vanessa

4  replied that Daughter had been seen by Dr. Swanston on February 5, 2014; that

5  Vanessa had called RCRMC when Daughter's blood glucose meter readings had

6  exceeded 400, and had been instructed by the attending physician to treat Daughter

7  with extra insulin, extra monitoring, and an over-the-counter ketone strip urinalysis

8  test, which had always come back negative; and that Daughter had an appointment

9  to see an endocrinologist on May 10, 2014 at Children's Hospital in San Diego,

10 California.

11     81.    Russo indicated to Vanessa that she was contacting her supervisor, and

12 made a private call by telephone to Santana.

13     82.    On information and belief, Russo relayed to Santana her opinion that

14 Daughter's blood glucose readings stored in the glucometer were "too variable," and

15 that Daughter and Son should be removed from Vanessa's custody for that reason.

16     83.    On information and belief, Santana and Russo agreed that Russo should

17 assume emergency custody of Daughter and Son and remove them from Vanessa's

18 home.

**CIVIL COMPLAINT FOR DAMAGES**

84.     On information and belief, Santana and Russo agreed to remove Son and Daughter from Vanessa's custody because Russo had determined that Daughter's blood glucose meter readings stored in the glucometer were "too variable."

85.     Immediately after completing her phone call to Santana, Russo informed Vanessa that she was taking emergency custody of both Daughter and Son.

86.     Vanessa asked Russo to state the allegations upon which the seizure of the children was being made.

87.     Russo refused to disclose to Vanessa the allegations upon which the seizure of the children was made, and refused to explain the situation further.

88.     Russo then told Vanessa that Vanessa should have agreed to a voluntary case plan at the TDM meeting in January 2014, that it was now "too late," and that if Vanessa did not turn over the children immediately, the sheriff's deputy would arrest Vanessa.

89.     On April 3, 2014, at approximately 11:45 a.m., Russo removed Daughter and Son from Vanessa's custody.

90.     Chambers-Munoz and Jones assisted Russo in removing Son and Daughter from Vanessa's custody.

91.     On information and belief, Daughter and Son were removed from Vanessa's custody without prior judicial authorization or court order.

**CIVIL COMPLAINT FOR DAMAGES**

92.     At the time of removal, Russo did not provide Vanessa with any documentation in writing stating the reasons why Daughter and Son had been removed from Vanessa's custody.

93.     On the afternoon of April 3, 2014, Son was taken by Russo to a foster home in Lake Elsinore, California.

94.     On Thursday, April 3, 2014, Chambers-Munoz transported Daughter to the Emergency Department at RCRMC, where Daughter was admitted for medical testing and placement until a medically-trained foster home could be found.

95.     On information and belief, Chambers-Munoz transported Daughter to RCRMC in consultation and agreement with Russo and Santana.

96.     On information and belief, Chambers-Munoz, Russo and Santana transported Daughter to RCRMC for the purpose of having her evaluated by a medical professional with specialized training, in order to determine her health status on admission with respect to diabetes.

97.     On information and belief, Chambers-Munoz, Russo and Santana sought to have Daughter examined at RCRMC for the purpose of determining whether Vanessa had neglected Daughter's care for diabetes.

**CIVIL COMPLAINT FOR DAMAGES**

1   98.   On information and belief, Chambers-Munoz instructed RCRMC that

2   there was to be "no visitation by parents, relatives, or anyone except CPS," or words

3   to that effect.

4   99.   On Friday, April 4, 2014, Vanessa attempted to contact the Department

5   numerous times, both by phone and in person, to determine the status of her children.

6   100.   On information and belief, a woman who identified herself as Russo's

7   "supervisor," and whom Plaintiffs believe to be Santana, refused to provide Vanessa

8   with any information, and instructed her to "go home and wait," or words to that

9   effect.

10   101.   On Friday, April 4, 2014, Vanessa contacted Dr. Swanston by phone.

11   102.   Dr. Swanston confirmed to Vanessa that she had examined Daughter

12   on April 4, 2014; that Dr. Swanston did not understand why Daughter had been

13   removed from Vanessa's custody or why Daughter had been brought to the

14   hospital; that Dr. Swanston did not have any concerns over Vanessa's care for

15   Daughter's diabetes; that Dr. Swanston did not have any concerns about Vanessa

16   visiting Daughter in the hospital; and that Dr. Swanston had conveyed this

17   information to Russo.

18   103.   On information and belief, on Monday, April 7, 2014, Christina Engel,

19   a caseworker with Riverside County Department of Public Social Services Child

**CIVIL COMPLAINT FOR DAMAGES**

1   Protective Services, and who is not a party to this proceeding, filed a juvenile

2   dependency petition against Vanessa in the Riverside County Superior Court.

3       104.   The petition alleged that Daughter and Son had "suffered, or there is a

4   substantial risk that the child will suffer, serious physical harm or illness as a result of

5   the failure or inability of his or her parent or legal guardian to supervise or protect the

6   child adequately" and "by the willful or negligent failure of the parent or legal

7   guardian to provide the child with adequate food, clothing, shelter, or medical

8   treatment."

9       105.   The petition further alleged that Vanessa had "failed to follow through

10  with obtaining medical insurance and medical care" for Daughter, and that "the

11  children are not enrolled in school and the mother subjects the children to a transient

12  life style [*sic*], often living in a van, panhandling, and relying on strangers to provide

13  basic provisions for the children's care."

14      106.   In actual fact, Vanessa had medical insurance for Daughter; Vanessa

15  was educating Son at home, in compliance with California law; Vanessa had been

16  seeking permanent housing, first in San Diego County, and then in Oregon, since

17  Daughter was diagnosed with diabetes in January 2014; and Vanessa and the children

18  had not been engaged in a "transient life-style" since Daughter was diagnosed with

19  diabetes in January 2014.

**CIVIL COMPLAINT FOR DAMAGES**

107.   The Petition included a "Detention Report," dated April 7, 2014, which was signed under oath by Russo and Santana.

108.   Russo's report focused largely on Daughter's diabetes, citing unspecified "medical research" in support of her conclusion that Daughter's diabetes was not being adequately treated, and described Daughter's blood glucose test results as "alarming and extremely dangerous," among other similar descriptions.

109.   Russo's detention report indicated that Daughter's blood glucose level at the time of removal was 371.

110.   In actual fact, Daughter's blood glucose level at the time of removal was 261.

111.   Russo's report asserted that "normal sugar levels are from 80 to 110, with a margin of 10 points maximum," and that of the readings she observed on the glucometer, "only three times the sugar level was normal, four times too low and the rest of the readings were abnormally high and three times the machine did not register the sugar level. This is due to the level being too high, so the machine only shows error."

112.   On information and belief, Russo reached these conclusions based on her personal assessment of the blood glucose readings stored in Daughter's blood

**CIVIL COMPLAINT FOR DAMAGES**

1  glucose meter and her own experience with adult type 2 diabetes, which led her to

2  believe that Daughter's "normal" sugar levels should be within 80 and 110.

3       113.   On information and belief, Russo lacks the requisite medical training,

4  degree, or license to opine about the normal blood sugar levels and blood sugar range

5  for a child of Daughter's age with new-onset type 1 juvenile diabetes.

6       114.   On information and belief, Russo is not a technician or otherwise

7  qualified to explain why Daughter's glucometer registered an error during past

8  readings.

9       115.   Russo's report further asserted that Daughter had "uncontrolled" and

10  "alarming [*sic*] fluctuating" sugar levels while under Vanessa's care, that Daughter

11  "needs continued medical care and close monitoring of her serious medical

12  condition," and that "the intervention of the Court is imperative in this situation in

13  order to provide to [*sic*] the children with a stable and well rounded [*sic*]

14  environment, as well as providing them with the needed medical and dental care they

15  need."

16       116.   Russo's detention report also alleged that Vanessa "lives a 'counter-

17  culture lifestyle' and likes moving around from state to state," that she leads an

18  "unstable, nomadic lifestyle," and that she "has had a nomadic, controversial life

19  style [*sic*] and has been traveling from state to state."

**CIVIL COMPLAINT FOR DAMAGES**

117.   Russo indicated that at some point during her investigation of Vanessa, she learned that Vanessa "belongs to the 'Rethinking Everything' (RE), wich [*sic*] is a diverse community of re-thinkers from around the globe, who challenge conventional views and education, work, parenting, marriage, sex, death and life."

118.   Russo indicated that she had conducted her own independent research into Rethinking Everything, and found "some of the concepts such as 'unschooling' which means that nobody does anything they don't want to do. Or, in other, more positive words, everyone crafts a self-directed life doing the things they love to do. Another interesting concept is that parents believe that children at very young ages, are capable of choosing their own foods and learning from their choices. The parents do not need to make decisions for them. RE Community is filled with families and individuals who are leading, or who are on the path of living, a self-designed life. RE supports the belief that children are capable of observing and using knowledge from a complex world. There is no need for arbitrary structure in parenting or education, such as the use of coercion, rewards, or other behavior modification techniques."

119.   On April 7, 2014, upon learning that Dr. Swanston had examined Daughter on April 4, 2014, Vanessa's counsel issued a subpoena for Dr. Swanston to appear before the Superior Court, to testify as to Daughter's past and current medical condition, care, and treatment.

**CIVIL COMPLAINT FOR DAMAGES**

120.   On or around April 7, 2014, Vanessa's counsel also arranged for Dr. Gaja Andzel, an endocrinologist with the Beaver Medical Group in Yucaipa, California, to be available to testify by phone as an expert witness on behalf of Vanessa at the detention hearing.

121.   On April 8, 2014, a detention hearing was held before the Honorable John M. Monterosso, Superior Court of California for the County of Riverside.

122.   Russo was in attendance at the detention hearing on April 8, 2014.

123.   At the beginning of the detention hearing, the petition was submitted on the detention report prepared by Russo and Santana on April 7, 2014.

124.   At the detention hearing, Vanessa's counsel offered to provide evidence in support of Vanessa's objection to the continued detention of Daughter and Son.

125.   Judge Monterosso declined to hear this testimony at the hearing, as he had a meeting in fifteen minutes, but stated that Vanessa "ha[d] a right, although limited, to present testimony," and that the court did not "want to restrict [Vanessa's] ability to present a case."

126.   Had Vanessa's counsel been permitted to proffer this evidence, Dr. Andzel was prepared to testify that Daughter's blood glucose levels, as reported by Russo in the detention report, were within the acceptable range for a child of Daughter's age with recently diagnosed new-onset type 1 juvenile diabetes.

**CIVIL COMPLAINT FOR DAMAGES**

127.   Judge Monterosso indicated that he did not "see a shred of evidence that would justify detaining [Son], not a shred," and ordered that Vanessa be permitted to visit Daughter at the hospital.

128.   Judge Monterosso then adjourned the detention hearing until the following morning.

129.   On April 8, 2014, after the detention hearing, Vanessa went to RCRMC to visit Daughter, pursuant to the court's order.

130.   Upon arriving at the hospital, the staff at RCRMC initially denied Vanessa access to Daughter, telling her, "No, sorry, it's only going to be an hour until the child's discharged," or words to that effect.

131.   Vanessa was ultimately permitted by the Department to visit Daughter in the hospital for an hour on April 8, 2014.

132.   The parties reconvened for the detention hearing on April 9, 2014, at which point in time the county counsel, on behalf of the Department, represented to the court that "the child, [Daughter], is still in the hospital with uncontrolled sugars, the diabetes. She is very fragile."

133.   The guardian ad litem similarly represented to the court that Daughter was in a "potentially medically-fragile condition of diabetes."

**CIVIL COMPLAINT FOR DAMAGES**

1    134.   On information and belief, the representations of both the county

2    counsel and the guardian ad litem were made in reliance upon Russo's representation

3    in the detention report that Daughter had "uncontrolled" and "alarming [*sic*]

4    fluctuating" sugar levels, and that Daughter needed "continued medical care and

5    close monitoring of her serious medical condition."

6    135.   After receiving recommendations of continued detention from the

7    county counsel and guardian ad litem, Judge Monterosso informed Vanessa's

8    counsel that with regard to the presentation of evidence, "this is a detention hearing.

9    This is not the trial on the merits of the allegations."

10    136.   Vanessa's attorney explained to Judge Monterosso that Vanessa

11    disputed the allegations in the report that Daughter's condition was fragile, and that

12    an endocrinologist was ready to testify by phone.

13    137.   Judge Monterosso interrupted Vanessa's proffer of expert medical

14    testimony, and told Vanessa's counsel that although he would hear testimony from

15    Vanessa, "I'm not going to take medical testimony at a detention hearing," and that

16    "the purpose of the hearing today is not for the Department to prove by a

17    preponderance of the evidence the truth or veracity of the allegations. That's not the

18    standard. I don't mean to educate you. That's not my role, but that's not the purpose

19    of this proceeding."

**CIVIL COMPLAINT FOR DAMAGES**

1      138.   Had Vanessa's counsel been permitted to proffer this evidence, Dr.

2  Andzel was once again prepared and available by phone to testify that Daughter's

3  blood glucose levels, as reported by Russo in the detention report, were within the

4  acceptable range for a child of Daughter's age with recently diagnosed new-onset

5  type 1 juvenile diabetes.

6      139.   In lieu of her proffered medical testimony, Vanessa testified at great

7  length on her care of Daughter; that Daughter had been under the care of Dr.

8  Swanston since January 2014; that Dr. Swanston had never expressed concern about

9  Daughter's health, safety, and welfare, or about Vanessa's treatment of Daughter;

10  that Daughter had not exhibited any repeat of the symptoms that resulted in her initial

11  treatment at RCRMC in January 2014; that based on Vanessa's instruction at

12  RCRMC, the readings reported by Russo were within the normal range for a child of

13  Daughter's age with type 1 juvenile diabetes; that Vanessa had arranged for a new

14  pediatrician in Oregon; that Vanessa had a bachelor's degree in psychology; that

15  Vanessa was one class away from obtaining a degree as a master teacher; that

16  Vanessa had been specifically trained in creating curriculum; that Vanessa traveled

17  with her children "to show them this rich, incredible world that we have and to spend

18  every moment with them, helping them process it, understand it, explore it"; and that

19  Vanessa wanted her children to have a rich education.

**CIVIL COMPLAINT FOR DAMAGES**

140.   During closing arguments, the county counsel argued that "today is not the day to bring forth expert testimony as to what are the ranges of [glucose reading] numbers," but that "[n]ormal ranges [for blood glucose levels] are 80 to 110," that the "[t]arget for a Type 1 fragile child could be from 80 to 200," that "there's a lot of not normal or not even target-range numbers [among the numbers stored in Daughter's blood glucose meter] and that we all agree that the child is medically fragile," and that Daughter "remains at the hospital to this date because the hospital's unable to stabilized [*sic*] the blood sugar and finds this child to be very medically fragile."

141.   At the hearing, neither the county counsel nor the Department proffered any evidence from a person with relevant medical training, degree, or license as to the normal ranges of blood sugar in a four-year-old child with new-onset type 1 juvenile diabetes.

142.   At the hearing, neither the county counsel nor the Department introduced any evidence on the record to the effect that Daughter remained at the hospital, that the hospital had been unable to stabilize Daughter's blood sugar level, or that the hospital had deemed Daughter "very medically fragile."

**CIVIL COMPLAINT FOR DAMAGES**

1    143.   At the hearing, neither the county counsel nor the Department

2    introduced any evidence on the record to the effect that Vanessa was not teaching

3    Son at home in compliance with the law of the state of California.

4    144.   At the hearing, neither the county counsel nor the Department

5    introduced any evidence on the record to the effect that Vanessa's home-

6    instruction of Son posed a substantial danger to Son's physical health.

7    145.   At the conclusion of the detention hearing, Judge Monterosso entered

8    findings, relying upon the allegations in the petition, the testimony of Vanessa, and

9    Russo's detention report.

10    146.   Judge Monterosso found that, although "counsel has presented evidence

11    to contradict some of the facts that are the basis of the allegations in the Petition, and

12    while I'll acknowledge there very well may be some issues that can be developed

13    further and may very well shed doubt on some, perhaps all, of the allegations, at this

14    point in time, the Department has met their burden by at least showing a prima facie

15    case to each of the allegations in the Petition."

16    147.   Judge Monterosso relied explicitly on Russo's representations in the

17    detention report that "[Daughter's] needs had not been adequately met to care for her

18    diabetic condition that she's suffering from,"  that Daughter was "medically fragile,"

19    that Vanessa lead "a lifestyle that's really sort of indifferent and not very diligent in

**CIVIL COMPLAINT FOR DAMAGES**

1    ensuring the basic needs of the children," and that Vanessa was "focused too much

2    on the big things," such as "enlightenment as to the ways of the world," and "not

3    worried about the little things as much."

4         148.    Based on these findings, Judge Monterosso ordered Daughter's

5    continued detention in the custody of the Department.

6         149.    Although Judge Monterosso found that Son did not have a fragile

7    medical condition, and that "this isn't a truancy report," he nonetheless ordered Son's

8    continued detention. Judge Monterosso stated that, in his opinion, there was no

9    evidence that Son had "received any home schooling of substance," and that "the

10   transient nature of mother's lifestyle," coupled with the lack of "formal education,"

11   resulted in emotional suffering for Son.

12        150.    Although the detention report includes a boilerplate assertion that "the

13   child is suffering severe emotional damage," and the bare assertion that "Ms. Wilson

14   appears to be unaware of the . . . emotional . . . harm her children have been

15   subjected due to her controversial and unique ideologies," the detention report

16   contains no allegations of fact which suggested that Son had actually experienced

17   emotional suffering while in Vanessa's custody, that this alleged emotional suffering

18   would continue if Son were returned to Vanessa's custody, or that this alleged

19   emotional suffering posed a substantial danger to Son's physical health.

- 32 -
**CIVIL COMPLAINT FOR DAMAGES**

151.   Judge Monterosso conditioned Son's return on Vanessa finding "a stable and suitable residence," and "taking steps to provide for [Son]'s educational needs. I'm not going be specific. My preference to ensure he gets caught up and is at the right level is public school. Doesn't sound like that's going to be possible because of the lack of immunizations. It's going to be a big, big hurdle to overcome. I don't think from what I'm hearing despite her education that Ms. Vanessa is in a position to provide adequate home schooling. From what I've read, he hasn't learned anything, quite frankly, maybe some things about insight into the world but there are areas lacking significantly, but I'll issue that authorization."

152.   A jurisdictional disposition hearing was set for Tuesday, April 29, 2014.

153.   Between the detention hearing on April 9, 2014, and the jurisdictional disposition hearing on April 29, 2014, Defendants placed Son in public school in Hemet, California.

154.   Vanessa did not consent to the placement of Son in public school.

155.   The Department did not contact Vanessa for consent to place Son in public school.

156.   The Department's petition did not recommend that Judge Monterosso take any action as to Son's education.

**CIVIL COMPLAINT FOR DAMAGES**

157.   Judge Monterosso's order at the detention hearing on April 9, 2014, did not contain any order as to Son's education, did not adjudge Son to be a dependent child, and did not temporarily limit Vanessa's right to make educational decisions for Son.

158.   Judge Monterosso's order failed to find that Vanessa was unavailable, unable, or unwilling to exercise educational services rights for Son, that the Department had made diligent efforts to locate Vanessa's participation in Son's educational decision making, and that Son's educational needs could not be met without the temporary appointment of a responsible adult.

159.   Judge Monterosso did not find that no relative, nonrelative extended family member, or other adult known to the child was available and willing to serve as Son's educational representative, did not enter any educational decisions for Son, and did not authorize the Department to make independent educational decisions on behalf of Son, without Vanessa's consent and approval.

160.   Vanessa was ultimately permitted to have her first supervised visitation with Son and Daughter on April 18, 2014, fifteen days after both children were initially removed from Vanessa's custody.

161.   On April 22, 2014, Vanessa's counsel issued a subpoena to RCRMC, requesting production of Daughter's medical records.

**CIVIL COMPLAINT FOR DAMAGES**

1      162.   On April 23, 2014, the subpoena was served on RCRMC.

2      163.   On April 29, 2014, the day that the jurisdictional disposition hearing

3   was to take place, RCRMC produced Daughter's medical records for review by

4   Vanessa's counsel.

5      164.   Daughter's medical records revealed that Chambers-Munoz had

6   admitted Daughter to RCRMC on April 3, 2014; that Chambers-Munoz requested

7   that Daughter be examined for evidence of child neglect; that Daughter was

8   examined by Dr. Swanston; and that Chambers-Munoz had informed Dr. Swanston

9   that Daughter was "not having any complaints other than being tired and thirsty."

10      165.   Daughter's medical records further revealed that on April 4, 2014, the

11   day after Daughter was removed from Vanessa's custody, Dr. Swanston had

12   arranged for Daughter to undergo a hemoglobin A1C test; that Daughter was "set to

13   [be] discharge[d] today, per MD team, as [Daughter] is medically stable"; that Dr.

14   Swanston believed that Daughter would benefit from a visit from Vanessa; that Dr.

15   Swanston informed Russo of these conclusions; and that Russo determined that

16   "there will be no change in the plan to not allow mother to the bedside at this time."

17      166.   Daughter's medical records further revealed that on April 5, 2014, two

18   days after Daughter was removed from Vanessa's custody, Dr. Swanston reviewed

19   the results of Daughter's hemoglobin A1C test; that Daughter's hemoglobin A1C test

**CIVIL COMPLAINT FOR DAMAGES**

1   produced a result of 8.3%; that this result indicated to Dr. Swanston that Daughter

2   was "improving from January 2014," when Daughter's hemoglobin A1C test

3   produced a result of 11%; that Daughter's "blood sugars [were] stable"; and that

4   "SW/case manager [were] to arrange discharge conditions as soon as possible since

5   patient is medically stable."

6         167.   Daughter's medical records further revealed that on April 6, 2014, two

7   days before the detention hearing was originally scheduled to take place, two

8   attending nurses at RCRMC indicated that Daughter's "sugars are stable" and

9   Daughter's "vocabulary and developmental health appear appropriate."

10        168.   Daughter's medical records further revealed that on April 6, 2014,

11  Daughter was examined by a second physician, Dr. Sophia L. Bradley, who indicated

12  that Daughter's diabetes was "improving from Jan 2014," and that discharge was

13  being arranged "as soon as possible since patient is medically stable."

14        169.   Daughter's medical records further revealed that on April 7, 2014, the

15  day before the detention hearing was to take place, a third attending nurse reported

16  that Daughter's vital signs were "stable and afebrile," and that her blood sugar levels

17  were "stable."

18        170.   Daughter's medical records further revealed that on April 8 and 9, 2014,

19  when the detention hearing was held, Daughter remained at RCRMC not because

**CIVIL COMPLAINT FOR DAMAGES**

1   Daughter had "uncontrolled sugars," but because the Department had taken over a

2   week to locate and train a foster parent who could properly manage Daughter's

3   diabetes.

4       171.   Daughter's medical records further revealed that Daughter was

5   ultimately discharged from RCRMC on April 10, 2014, the day after the detention

6   hearing.

7       172.   Daughter's medical records further revealed that on April 18, 2014,

8   Daughter was examined at RCRMC by a third physician, Dr. John Mace, a specialist

9   in endocrinology, diabetes, metabolism, and pediatrics.

10       173.   Following standard hospital protocols, Dr. Mace compared the results of

11   Daughter's hemoglobin A1C test administered on April 4, 2014, with the results of

12   Daughter's hemoglobin A1C test administered on January 2, 2014.

13       174.   Dr. Mace's comparison of the two tests revealed that Daughter's

14   hemoglobin A1C test results had fallen from 11% on January 2, 2014, to 8.3% on

15   April 4, 2014, with an average decrease in blood glucose level from 269 on January

16   2, 2014, to 192 on April 4, 2014.

17       175.   Upon reviewing both the January and the April hemoglobin A1C test

18   results, Dr. Mace concluded that he was "not aware of any conditions which

19   represented an immediate threat to [Daughter's] health upon [Daughter]'s admission

- 37 -
**CIVIL COMPLAINT FOR DAMAGES**

1   to RCRMC on April 3, 2014. The April 4, 2014 hemoglobin A1C test results

2   indicated that the diabetic insulin regimen was refined sufficiently to meet the needs

3   of her condition and that she was progressing satisfactorily. In my opinion, based on

4   the hemoglobin A1C test results mentioned above, and based on my examination of

5   [Daughter] in April 2014, [Daughter]'s recently diagnosed type 1 diabetes appears to

6   have been competently supervised and managed during the period prior to my having

7   seen her," or words to that effect.

8          176.   On information and belief, prior to the detention hearing on April 8 and

9   April 9, 2014, Defendants Russo, Santana, and Chambers-Munoz knew or should

10  have known that Daughter's overall medical condition and blood sugar levels were

11  "stable"; that Daughter's hemoglobin A1C test indicated that Daughter's new-onset

12  type 1 juvenile diabetes had improved from January 2014 through April 2014; and

13  that Daughter had remained at the hospital only because of the Department's failure

14  to procure a foster parent with appropriate medical training, not because RCRMC

15  had been "unable to stabilized [sic] the blood sugar."

16         177.   At no point in time, either prior to or at the detention hearing on April 8

17  and 9, 2014, did Russo, Santana, or Chambers-Munoz disclose to Vanessa or

18  Vanessa's counsel the results of Dr. Swanston's examination of Daughter on April 4,

19  2014, or the results of Dr. Bradley's examination of Daughter on April 6, 2014.

- 38 -
**CIVIL COMPLAINT FOR DAMAGES**

178.    On information and belief, at no point in time, either prior to or at the detention hearing on April 8 and 9, 2014, did Russo, Santana, or Chambers-Munoz disclose to Judge Monterosso the results of Dr. Swanston's examination of Daughter on April 4, 2014, or the results of Dr. Bradley's examination of Daughter on April 6, 2014.

179.    Upon reviewing these medical records, which had been received on April 29, 2014, Vanessa's counsel subpoenaed Dr. Swanston and Dr. Mace to testify at the jurisdictional disposition hearing scheduled for that very day.

180.    On April 29, 2014, defendants Keith Baker and Maribell Partida presented a "Jurisdiction/Disposition Report" to Judge Monterosso, which Baker and Partida had signed under oath.

181.    This second report recommended that the court find the allegations in the petition to be true, and that Son and Daughter should both "remain in out-of-home care."

182.    This second report restated substantially Russo's initial findings in the detention report, including that when Son and Daughter were initially removed from Vanessa's custody on April 3, 2014, "only 3" of Daughter's blood glucose meter readings were found to be in the "normal" range, that the "majority" of these blood glucose meter readings were "abnormally high," "dangerously high," and "alarming

**CIVIL COMPLAINT FOR DAMAGES**

and extremely dangerous," and that Vanessa "has had a rather controversial and nomadic life style [*sic*]" and "ideological views," which had contributed to the initial order to detain Son and Daughter.

183.   On information and belief, Baker and Partida had access to Daughter and Son's case files in the preparation of their Jurisdiction/Disposition Report.

184.   On information and belief, based on Daughter's case file, Baker and Partida knew or should have known of Daughter's medical records pertaining to Daughter's treatment at RCRMC in January 2014, including the results of Daughter's hemoglobin A1C test and blood glucose meter test administered prior to her discharge from RCRMC; the results of Daughter's hemoglobin A1C test administered on April 4, 2014; the results of Dr. Swanston's examination of Daughter on April 4, 2014; the results of Dr. Bradley's examination of Daughter on April 6, 2014; and the results of Dr. Mace's examination of Daughter on April 18, 2014.

185.   At the jurisdictional disposition hearing on April 29, 2014, Judge Monterosso indicated to Vanessa's counsel that there would not be sufficient time remaining in the day to conduct the jurisdictional hearing, or to take testimony from witnesses.

**CIVIL COMPLAINT FOR DAMAGES**

186.    Vanessa's counsel stated on the record that Vanessa had subpoenaed two physicians, who were present outside the courtroom to testify on her behalf.

187.    The court asked Dr. Swanston and Dr. Mace to provide their names on the record, and ordered them to appear at the upcoming jurisdictional disposition hearing, which Judge Monterosso then rescheduled for May 23, 2014.

188.    On information and belief, on April 29, 2014, defendants Russo, Santana, Chambers-Munoz, Baker, and Partida knew or should have known that Dr. Mace had concluded, after examining Daughter on April 18, 2014, that he was "not aware of any conditions which represented an immediate threat to her health upon [Daughter]'s admission to RCRMC on April 3, 2014," and that "[Daughter]'s recently diagnosed type 1 diabetes appears to have been competently supervised and managed during the period prior to" Dr. Mace's examination of Daughter on April 18, 2014.

189.    The jurisdiction/disposition report filed by Baker and Partida did not disclose the results of Dr. Swanston's examination of Daughter on April 4, 2014, the results of Dr. Bradley's examination of Daughter on April 6, 2014, or the results of Dr. Mace's examination of Daughter on April 18, 2014.

190.    At no point in time, either prior to or at the scheduled jurisdictional disposition hearing on April 29, 2014, did Russo, Santana, Chambers-Munoz, Baker,

**CIVIL COMPLAINT FOR DAMAGES**

or Partida disclose to Vanessa or Vanessa's counsel the results of Dr. Swanston's examination of Daughter on April 4, 2014, the results of Dr. Bradley's examination of Daughter on April 6, or the results of Dr. Mace's examination of Daughter on April 18, 2014.

191.   On information and belief, at no point in time, either prior to or at the jurisdictional disposition hearing on April 29, 2014, did Russo, Santana, Chambers-Munoz, Baker, or Partida disclose to Judge Monterosso the results of Dr. Swanston's examination of Daughter on April 4, 2014, the results of Dr. Bradley's examination of Daughter on April 6, 2014, or the results of Dr. Mace's examination of Daughter on April 18, 2014.

192.   Without taking any additional evidence, Judge Monterosso continued the jurisdictional disposition hearing until May 23, 2014.

193.   As Judge Monterosso did not alter his previous order authorizing the Department to detain Daughter and Son, Daughter and Son remained in the Department's custody, pending the rescheduled jurisdictional hearing to be held twenty-four (24) days later.

194.   On May 2, 2014, the Department returned Son to Vanessa's custody.

195.   On May 21, 2014, Dr. Mace indicated to Vanessa's counsel that he would be willing to sign a sworn statement to the effect that on April 18, 2014, he

**CIVIL COMPLAINT FOR DAMAGES**

1   had reviewed Daughter's hospital records and discovered that Daughter was

2   originally admitted to RCRMC in January 2014; that Daughter had a hemoglobin

3   A1C test result of 11% in January 2014, which converted to an average blood sugar

4   level of 269; that he had also reviewed a second hemoglobin A1C test that Daughter

5   received on April 4, 2014, with a result of 8.3%, or an average blood sugar level of

6   192; that this second reading was "very good for a child of this age under these

7   circumstances"; that "the comparative decrease of the hemoglobin A1C test results

8   between January 2, 2014 and April 4, 2014 is indicative of good care and effective

9   maintenance of the recently diagnosed diabetes condition"; that blood sugar levels

10  for a child of Daughter's age with type 1 diabetes is best kept in the range of 80 and

11  300, but can range between 80 and 400; that "an isolated blood sugar reading of 371

12  is not considered "'extremely high'"; that "I am not aware of any conditions which

13  represented an immediate threat to her health upon [Daughter]'s admission to

14  RCRMC on April 3, 2014. The April 4, 2014 hemoglobin A1C test results indicated

15  the that [sic] diabetic insulin regimen was refined sufficiently to meet the needs of

16  her condition and that she was progressing satisfactorily"; and that "In my opinion,

17  based on the hemoglobin A1C test results mentioned above, and based on my

18  examination of [Daughter] in April 2014, [Daughter]'s recently diagnosed type 1

**CIVIL COMPLAINT FOR DAMAGES**

1   diabetes appears to have been competently supervised and managed during the period

2   prior to my having seen her."

3       196.   Prior to the jurisdictional disposition hearing on May 23, 2014,

4   Vanessa's counsel contacted the county counsel by phone and informed her that he

5   was aware of Dr. Mace's examination of Daughter on April 4, 2014, that Dr. Mace

6   was of the opinion that there was no medical emergency on April 3, 2014, that Dr.

7   Mace had concluded that Daughter's diabetic care had been satisfactory while in

8   Vanessa's custody, and that Dr. Mace was prepared to sign a sworn statement to this

9   effect.

10      197.   Upon considering this information, the county counsel decided to

11  withdraw the petition against Vanessa.

12      198.   At the disposition hearing on May 23, 2014, Judge Monterosso

13  accepted the dismissal of the petition and returned Daughter to the custody of

14  Vanessa.

15      199.   In sum, the defendants involuntarily separated Son from Vanessa for a

16  period of twenty-nine (29) days, from April 3, 2014, until May 2, 2014.

17      200.   In sum, the defendants involuntarily separated Daughter from Vanessa

18  for a period of fifty (50) days, from April 3, 2014, until May 23, 2014.

**CIVIL COMPLAINT FOR DAMAGES**

201.   Pursuant to CAL. GOV. CODE §§ 910 and 915, Plaintiffs timely filed a

Claim for Damages to Person or Property against the County of Riverside, arising

from defendants' unconstitutional and unlawful seizure, detention, and separation

of Son and Daughter from Vanessa.

202.   On October 22, 2014, Plaintiffs' Claim for Damages to Person or

Property was rejected by the County of Riverside Board of Supervisors.

**FIRST CAUSE OF ACTION**
**Violation of Fourth Amendment – Initial Seizure without Justification**
**(By N.F. and N.K. against Defendants Russo, Santana,**
**Chambers-Munoz, and Jones)**

203.   The allegations contained in paragraphs 1 through 202 are hereby

realleged and incorporated by reference herein.

204.   Defendants Russo and Santana, with the cooperation and assistance of

Defendants Chambers-Munoz and Jones, violated N.F. and N.K.'s Fourth

Amendment rights, in that defendants wrongfully seized N.F. and N.K. based

solely on Russo's personal conclusions drawn from a brief observation of archived

readings stored on N.F.'s blood glucose meter, which were drawn by a caseworker

without medical training or degree or license and without any attempt to consult

with any other person with relevant medical training or degree or license, and

which did not give rise to reasonable cause to believe that either N.F. or N.K. were

**CIVIL COMPLAINT FOR DAMAGES**

1    in imminent danger of serious bodily injury as a result of new-onset type 1 juvenile

2    diabetes.

3         205.   Plaintiffs allege that as a result of the violations of their civil rights

4    described above each has suffered and will continue to suffer for an as yet

5    undetermined length of time the following:

6              a.  Mental pain and suffering;

7              b.  Emotional distress; and

8              c.  Loss of enjoyment of life.

9                        **SECOND CAUSE OF ACTION**
10   **Violation of Fourth Amendment – Continued Detention without Justification**
11   **(By N.F. and N.K. against Defendants Russo, Santana, and Chambers-Munoz)**

12        206.   The allegations contained in paragraphs 1 through 202 are hereby

13   realleged and incorporated by reference herein.

14        207.   Defendants Russo, Santana, and Chambers-Munoz violated N.K.'s

15   Fourth Amendment rights in that defendants wrongfully seized and detained N.K.

16   for twenty-nine (29) days, from April 3, 2014 until May 2, 2014, without medical

17   emergency, probable cause, or any other constitutional justification.

18        208.   Defendants Russo, Chambers-Munoz, and Santana violated N.F.'s

19   Fourth Amendment rights in that defendants wrongfully seized and detained N.F.

20   for fifty (50) days, from April 3, 2014 until May 23, 2014, without medical

- 46 -
**CIVIL COMPLAINT FOR DAMAGES**

1  emergency, probable cause, or any other constitutional justification, even though

2  the defendants knew or should have known on April 4, 5, 6, 7, and 18, 2014 that,

3  according to their own physicians, Daughter's blood sugar level on April 3, 2014,

4  was within the normal range for a four-year-old child with new-onset type 1

5  juvenile diabetes; that Daughter's medical condition was stable, had improved

6  since January 2014 under Vanessa's care; and that "[Daughter]'s recently diagnosed

7  type 1 diabetes appears to have been competently supervised and managed during the

8  period prior to" Daughter's seizure by defendants.

9      209.   Plaintiffs allege that as a result of the violations of their civil rights

10  described above each has suffered and will continue to suffer for an as yet

11  undetermined length of time the following:

12          a.  Mental pain and suffering;

13          b.  Emotional distress; and

14          c.  Loss of enjoyment of life.

15                    **THIRD CAUSE OF ACTION**
16  **Violation of Fourteenth Amendment – Initial Removal without Justification**
17          **(By all Plaintiffs against Defendants Russo, Santana,**
18                    **Chambers-Munoz, and Jones)**

19      210.   The allegations contained in paragraphs 1 through 202 are hereby

20  realleged and incorporated by reference herein.

**CIVIL COMPLAINT FOR DAMAGES**

211.   Defendants Russo and Santana, with the cooperation and assistance of Defendants Chambers-Munoz and Jones, violated Plaintiffs' Fourteenth Amendment right to family integrity and privacy, in that defendants wrongfully removed N.F. and N.K. from the care and control of Vanessa based solely on Russo's personal, unqualified conclusions drawn from a brief observation of archived readings stored on N.F.'s blood glucose meter, and without any consultation with any person with relevant medical training or degree or license, which did not amount to probable cause or any other constitutional justification for the removal.

212.   Plaintiffs allege that as a result of the violations of their civil rights described above each has suffered and will continue to suffer for an as yet undetermined length of time the following:

   a.  Mental pain and suffering;

   b.  Emotional distress; and

   c.  Loss of enjoyment of life.

## FOURTH CAUSE OF ACTION
### Violation of Fourteenth Amendment – Continued Detention without Justification
### (By all Plaintiffs against Defendants Russo, Chambers-Munoz, and Santana)

213.   The allegations contained in paragraphs 1 through 202 are hereby realleged and incorporated by reference herein.

**CIVIL COMPLAINT FOR DAMAGES**

214.   Defendants Russo, Santana, and Chambers-Munoz violated Plaintiffs' Fourteenth Amendment right to family integrity and privacy, in that defendants wrongfully separated N.K. from the custody and control of Vanessa for twenty-nine (29) days, from April 3, 2014 until May 2, 2014, without medical emergency, probable cause, or any other constitutional justification, and interfered with the right of Vanessa to direct the education of N.K. by placing N.K. in public school, without Vanessa's consent or proper judicial authorization.

215.   Defendants Russo, Chambers-Munoz, and Santana violated Plaintiffs' Fourteenth Amendment right to family integrity and privacy, in that defendants wrongfully separated N.F. from the custody and control of Vanessa for fifty (50) days, from April 3, 2014 until May 23, 2014, without medical emergency, probable cause, or any other constitutional justification, even though the defendants knew or should have known on April 4, 5, 6, 7, and 18, 2014 that, according to their own physicians, N.F.'s medical condition was stable, had improved since January 2014 under Vanessa's care, and that "[N.F.]'s recently diagnosed type 1 diabetes appears to have been competently supervised and managed during the period prior to" N.F.'s seizure by defendants.

**CIVIL COMPLAINT FOR DAMAGES**

1    216.   Plaintiffs allege that as a result of the violations of their civil rights

2    described above each has suffered and will continue to suffer for an as yet

3    undetermined length of time the following:

4            a.  Mental pain and suffering;

5            b.  Emotional distress; and

6            c.  Loss of enjoyment of life.

7                                **FIFTH CAUSE OF ACTION**
8        **Violation of Fourteenth Amendment – Denial of Substantive Due Process**
9              **(By all Plaintiffs against Defendants Russo, Santana,**
10                  **Chambers-Munoz, Baker, and Partida)**

11   217.   The allegations contained in paragraphs 1 through 202 are hereby

12   realleged and incorporated by reference herein.

13   218.   Defendants Russo, Santana, and Chambers-Munoz violated Plaintiffs'

14   Fourteenth Amendment right to due process, in that defendants deliberately and

15   maliciously withheld from Plaintiffs and Vanessa's counsel the exculpatory results

16   of Daughter's medical examination by Dr. Swanston on April 4, 2014, and

17   Daughter's medical examination by Dr. Bradley on April 6, 2014, both of which

18   were in the actual or constructive possession of the defendants prior to the

19   detention hearing on April 8 and 9, 2014.

20   219.   Defendants Russo, Santana, Chambers-Munoz, Baker, and Partida

21   violated Plaintiffs' Fourteenth Amendment right to due process, in that defendants

**CIVIL COMPLAINT FOR DAMAGES**

1    deliberately and maliciously withheld from Plaintiffs and Vanessa's counsel the

2    exculpatory results of Daughter's medical examination by Dr. Swanston on April

3    4, 2014, Daughter's medical examination by Dr. Bradley on April 6, 2014, and

4    Daughter's medical examination by Dr. Mace on April 18, 2014, all of which were in

5    the actual or constructive possession of the defendants prior to the jurisdictional

6    disposition hearing on April 29, 2014.

7        220.    The evidence withheld by defendants Russo, Santana, Chambers-

8    Munoz, Baker, and Pardita was exculpatory of Vanessa, and material to the question

9    of whether Son and Daughter should remain involuntarily detained apart from

10    Vanessa.

11        221.    The exculpatory and material nature of the evidence withheld by

12    defendants Russo, Santana, Chambers-Munoz, Baker, and Partida is underscored by

13    the fact that as soon as Plaintiffs' counsel obtained Daughter's medical reports

14    through independent discovery, and informed the county counsel of both their

15    contents and of Dr. Mace's willingness to provide a sworn statement attesting to

16    their veracity, the county counsel promptly dismissed the petition and Daughter

17    was immediately returned to Vanessa's custody.

18        222.    This failure by defendants is especially egregious in light of the fact

19    that the superior court declined to receive Plaintiffs' proffers of medical evidence

**CIVIL COMPLAINT FOR DAMAGES**

1  on April 8, 9, and 29, 2014; that these refused proffers would have been

2  corroborated by the evidence already in the actual or constructive possession of the

3  defendants; and that the defendants had a statutory duty under state law to disclose

4  the results of these medical examinations to Vanessa and her counsel pursuant to

5  CAL. WELF. & INST. CODE § 324.5(a).

6        223.   Plaintiffs allege that as a result of the violations of their civil rights

7  described above each has suffered and will continue to suffer for an as yet

8  undetermined length of time the following:

9            a.  Mental pain and suffering;

10           b.  Emotional distress; and

11           c.  Loss of enjoyment of life.

**SIXTH CAUSE OF ACTION**
**Violation of Fourteenth Amendment – Denial of Procedural Due Process**
**(By all Plaintiffs against Defendants Russo, Santana,**
**Chambers-Munoz, Baker, and Partida)**

16       224.   The allegations contained in paragraphs 1 through 202 are hereby

17  realleged and incorporated by reference herein.

18       225.   Defendants Russo, Santana, and Chambers-Munoz violated Plaintiffs'

19  Fourteenth Amendment right to procedural due process, in that prior to April 8 and

20  9, 2014, defendants Russo, Santana, and Chambers-Munoz had actual or

21  constructive knowledge of the results of Daughter's medical examination by Dr.

- 52 -
**CIVIL COMPLAINT FOR DAMAGES**

Swanston on April 4, 2014, and the results of Daughter's medical examination by Dr. Bradley on April 6, 2014; that these examinations resulted in medical evidence that was exculpatory of Vanessa and material to the initial involuntary removal, and continued involuntary detention, of Daughter and Son; that defendants deliberately and maliciously failed to disclose this exculpatory and material medical evidence to Judge Monterosso on or prior to April 8 and 9, 2014; that defendants' deliberate and malicious failure to disclose this exculpatory and material medical evidence subverted the court's ability to decide the detention question fairly, and precluded the court from making a fully informed decision when it ratified the defendants' recommendation of continued detention; and that defendants' deliberate and malicious failure to disclose this exculpatory and material medical evidence resulted in the continued detention of Son until May 2, 2014, and in the continued detention of Daughter until May 23, 2014.

226.   Defendants Russo, Santana, Chambers-Munoz, Baker, and Partida violated Plaintiffs' Fourteenth Amendment right to procedural due process, in that prior to April 29, 2014, defendants had actual or constructive knowledge of the results of Daughter's medical examination by Dr. Swanston on April 4, 2014, the results of Daughter's medical examination by Dr. Bradley on April 6, 2014, and the results of Daughter's medical examination by Dr. Mace on April 18, 2014; that

**CIVIL COMPLAINT FOR DAMAGES**

1   these examinations resulted in medical evidence that was exculpatory of Vanessa

2   and material to the continued involuntary detention of Daughter and Son; that

3   defendants deliberately and maliciously failed to disclose this exculpatory and

4   material medical evidence to Judge Monterosso on or prior to April 29, 2014; that

5   defendants' deliberate and malicious failure to disclose this exculpatory and

6   material medical evidence subverted the court's ability to decide the detention

7   question fairly, and precluded the court from making a fully informed decision

8   when it ratified the defendants' recommendation of continued detention; and that

9   defendants' deliberate and malicious failure to disclose this exculpatory and

10  material medical evidence resulted in the continued detention of Son until May 2,

11  2014, and in the continued detention of Daughter until May 23, 2014.

12      227.   The exculpatory and material nature of the evidence withheld by

13  defendants is underscored by the fact that as soon as Plaintiffs' counsel obtained

14  Daughter's medical reports through independent discovery, and informed the

15  county counsel of both their contents and of Dr. Mace's willingness to provide a

16  sworn statement attesting to their veracity, the county counsel promptly dismissed

17  the petition, the court entered the dismissal, and Daughter was ordered to be

18  immediately returned to Vanessa's custody.

**CIVIL COMPLAINT FOR DAMAGES**

228.   This failure by defendants is especially egregious in light of the fact that the superior court declined to receive Plaintiffs' proffers of medical evidence on April 8, 9, and 29, 2014; that these refused proffers would have been corroborated by evidence already in the actual or constructive possession of the defendants; and that the defendants had a statutory duty under state law to disclose the results of these medical examinations to Vanessa and her counsel pursuant to CAL. WELF. & INST. CODE § 324.5(a).

229.   Plaintiffs allege that as a result of the violations of their civil rights described above each has suffered and will continue to suffer for an as yet undetermined length of time the following:

      a.  Mental pain and suffering;

      b.  Emotional distress; and

      c.  Loss of enjoyment of life.

## SEVENTH CAUSE OF ACTION
### State Tort Claim – Failure to Disclose Results of Medical Examination
### (By all Plaintiffs against Defendants Russo, Santana, Chambers-Munoz, Baker, and Partida)

230.   The allegations contained in paragraphs 1 through 202 are hereby realleged and incorporated by reference herein.

231.   Pursuant to California state law, in a child welfare investigation where a petition is ultimately filed, a law enforcement agent or child welfare worker who

1  causes a child to undergo a physical examination by a medical practitioner with

2  specialized training in identifying whether a child has been neglected "shall

3  provide the results of the physical examination to the court and to any counsel for

4  the minor, and counsel for the parent or guardian of the minor." CAL. WELF. &

5  INST. CODE 324.5(a) (2014).

6       232.   On information and belief, on April 3, 2014, defendant Chambers-

7  Munoz, in agreement with defendants Russo and Santana, took Daughter to

8  RCRMC for the purpose of having her evaluated by a medical practitioner with

9  specialized training to determine whether Wilson had medically neglected Daughter

10  with respect to Daughter's diabetic care.

11       233.   In furtherance of this purpose, Daughter was examined by Dr. Swanston

12  on April 4, 2014, and Dr. Bradley on April 6, 2014, who both concluded at the end of

13  their examinations that Daughter's overall health condition and blood sugar levels

14  were stable, and that Daughter's hemoglobin A1C test results indicated that

15  Daughter's diabetes had improved from January 2014 to April 2014.

16       234.   In furtherance of this purpose, Daughter was examined by Dr. Mace on

17  April 18, 2014, who concluded that Daughter's April 2014 hemoglobin A1C test

18  results were "indicative of good care and effective maintenance of the recently

19  diagnosed diabetes condition," that Daughter's average blood sugar level of 192 on

1  April 4, 2014, was "very good for a child of this age under these circumstances," that

2  "an isolated blood sugar reading of 371 is not considered '"extremely high,'" that he

3  was "not aware of any conditions which represented an immediate threat to her

4  health upon [Daughter]'s admission to RCRMC on April 3, 2014," that Daughter's

5  diabetic condition was "progressing satisfactorily" prior to April 4, 2014, and that

6  "[Daughter]'s recently diagnosed type 1 diabetes appears to have been competently

7  supervised and managed during the period prior to my having seen her" on April 18,

8  2014.

9      235.   Prior to the detention hearing on April 8 and 9, 2014, the Department

10  filed a petition alleging that Vanessa had neglected to adequately care for Son and

11  Daughter.

12      236.   Prior to the detention hearing on April 8 and 9, 2014, defendants

13  Russo, Santana, and Chambers-Munoz had actual or constructive knowledge of the

14  results of Daughter's medical examination by Dr. Swanston on April 4, 2014, and

15  the results of Daughter's medical examination by Dr. Bradley on April 6, 2014.

16      237.   Prior to the jurisdictional disposition hearing on April 29, 2014,

17  defendants Russo, Santana, and Chambers-Munoz had actual or constructive

18  knowledge of the results of Daughter's medical examination by Dr. Mace on April

19  18, 2014.

**CIVIL COMPLAINT FOR DAMAGES**

1    238.   By seeking a petition to retain custody of Daughter and requesting that

2    a medical practitioner with specialized training examine Daughter for evidence of

3    medical neglect, defendants Russo, Santana, and Chambers-Munoz assumed a

4    statutory duty under state law to obtain and review the findings of Drs. Swanston,

5    Bradley, and Mace, and to "provide the results of the physical examination to the

6    court and to any counsel for the minor, and counsel for the parent or guardian of

7    the minor." CAL. WELF. & INST. CODE 324.5(a) (2014).

8    239.   Defendants Russo, Santana, and Chambers-Munoz breached this duty

9    by deliberately and maliciously failing to disclose the results of the physical

10   examinations conducted by Drs. Swanston, Bradley, and Mace to Vanessa,

11   Vanessa's counsel, or the court, on or prior to April 8, 9, or 29, 2014.

12   240.   On information and belief, prior to the jurisdictional disposition

13   hearing on April 29, 2014, defendants Baker and Partida had actual or constructive

14   knowledge of the results of Daughter's medical examination by Dr. Swanston on

15   April 4, 2014, the results of Daughter's medical examination by Dr. Bradley on

16   April 6, 2014, and the results of Daughter's medical examination by Dr. Mace on

17   April 18, 2014.

18   241.   By filing a jurisdiction/disposition report with the superior court on

19   April 29, 2014, defendants Baker and Partida assumed a statutory duty under state

**CIVIL COMPLAINT FOR DAMAGES**

1   law to obtain and review the findings of Drs. Swanston, Bradley, and Mace, and to

2   "provide the results of the physical examination to the court and to any counsel for

3   the minor, and counsel for the parent or guardian of the minor." CAL. WELF. &

4   INST. CODE 324.5(a) (2014).

5       242.   Defendants Baker and Partida breached this duty by deliberately and

6   maliciously failing to disclose the results of the physical examinations conducted

7   by Drs. Swanston, Bradley, and Mace to Vanessa, Vanessa's counsel, or the court,

8   on or prior to April 29, 2014.

9       243.   As a direct and proximate result of the defendants' breach of duty,

10   defendants Russo, Santana, Chambers-Munoz, Baker, and Pardita inflicted actual

11   harm on the plaintiffs, in that the defendants continued to involuntarily detain,

12   confine, and separate Son from Vanessa for twenty-nine (29) days, and continued

13   to involuntarily detain, confine, and separate Daughter from Vanessa for fifty (50)

14   days, after they knew that there was no medical basis for continued detention.

15       244.   The fact that defendants' breach of duty was the actual and proximate

16   cause of this involuntary detention, confinement, and separation is further

17   underscored by the fact that as soon as Plaintiffs' counsel obtained Daughter's

18   medical reports through independent discovery, and informed the county counsel

19   of both their contents and of Dr. Mace's willingness to provide a sworn statement

1  attesting to their veracity, the county counsel promptly dismissed the petition and

2  N.K. and N.F. were returned to Vanessa's custody.

3        245.   Plaintiffs allege that as a result of the violations of their civil rights

4  described above each has suffered and will continue to suffer for an as yet

5  undetermined length of time the following:

6              a.  Mental pain and suffering;

7              b.  Emotional distress; and

8              c.  Loss of enjoyment of life.

9  **PRAYER FOR RELIEF**

10  WHEREFORE, the Plaintiffs respectfully request that this court:

11        1.      Award compensatory damages in favor of each of the individual

12  Plaintiffs in an amount to be determined by the finder of fact in accordance with the

13  proof, plus interest at the legal rate until paid;

14        2.      Award punitive damages against Defendants for their conduct in willful

15  and wanton disregard of the rights of the Plaintiffs in an amount to be determined by

16  the finder of fact in accordance with the proof, plus interest at the legal rate until

17  paid;

18        3.      Award Plaintiffs costs and attorney's fees pursuant to 42 U.S.C. § 1988;

**CIVIL COMPLAINT FOR DAMAGES**

1          4.      Grant the Plaintiffs such other relief as may be deemed just and proper;

2    and

3          5.      Grant the Plaintiffs a trial by jury when the issues are joined.

4    Respectfully submitted:

5    Dated:  December 10, 2014          /s/ Darren A. Jones
6                                        **Darren A. Jones**   State Bar # 207966
7                                        HOME SCHOOL LEGAL DEFENSE ASSOCIATION
8                                        One Patrick Henry Circle
9                                        Purcellville, VA 20132
10                                       Phone: (540) 338-5600
11                                       Fax: (540) 338-1952
12                                       Email: darren@hslda.org

13                                       **Rex Alan Lowe, Esq.**  State Bar #103750
14                                       LAW OFFICE OF REX ALAN LOWE
15                                       630 South El Camino Real, Suite A
16                                       San Clemente, California 92672-4200
17                                       Tel.: 949.489.3045
18                                       Fax: 949.334.1223
19                                       E-mail: Law@RexLowe.com
20
21                                       *Attorneys for Plaintiff*

**CIVIL COMPLAINT FOR DAMAGES**